# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **GREGORY D. BROWN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:18-CV-190-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent** |

## MEMORANDUM OPINION AND ORDER

By consent of the parties and the order of transfer dated May 14, 2018 (doc. 21), this case has been transferred for the conduct of all further proceedings and the entry of judgment.  Before the Court is *Plaintiff's Motion for Summary Judgment or Remand*, filed May 14, 2018 (doc. 22).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED IN PART**, and the Commissioner's decision **REVERSED** and **REMANDED** for reconsideration.

## I. BACKGROUND[1]

### A.    Procedural History

Gregory D. Brown (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act.  (doc. 22-1 at 4.)  On February 23, 2015, he filed his application for DIB, alleging disability beginning on October 23, 2013.  (R. at 167-68.)  His claim was denied initially on July 17, 2015, and upon reconsideration on November 3, 2015.  (R. at 101,

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

107.) On December 8, 2015, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (R. at 111.) He appeared and testified at a hearing on October 26, 2016. (R. at 37-77.) On January 11, 2017, the ALJ issued a decision finding him not disabled and denying his claim for benefits. (R. at 17-33.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on January 19, 2017. (R. at 164-66.) The Appeals Council denied his request for review on October 26, 2017, making the ALJ's decision the final decision of the Commissioner. (R. at 5-10.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on April 1, 1969, and was 47 years old at the time of the hearing. (R. at 41, 167.) His highest grade of school completed was eleventh grade, and he could speak English fluently. (R. at 216, 218.) He had past relevant work experience as a building maintenance repairer and maintenance supervisor. (R. at 72.)

### 2.    Medical Evidence

On October 24, 2013, Plaintiff's left knee "gave out" when he was moving a refrigerator at work. (R. at 812-13.) He reported throbbing and sharp pain on the lateral side of his knee. (R. at 812.) He rated the initial pain a 10 out of 10. (R. at 813.) An x-ray of his left knee was negative for fracture or dislocation. (*Id.*) He had reduced range of motion and was diagnosed with left sprain of the lateral collateral ligament of the knee. (*Id.*) The recommendation was physical therapy, ice, a knee brace, and crutches to avoid weight-bearing. (*Id.*)

On October 30, 2013, Plaintiff presented for physical therapy and rehabilitation. (R. at 815-

16.)  He complained of a sharp pain in his left knee, which he rated as an 8 out of 10, and reported difficulty in standing, walking, and flexing of his knee. (R. at 815.)  He was observed using crutches and a brace for his left knee.  (*Id.*)  Passive therapy was initiated due to swelling, muscle spasms, and limited range of motion.  (R. at 816, 849.)

Plaintiff attended six physical therapy sessions between October 31, 2013 and November 12, 2013. (R. at 843-48.)  At each session, he reported his pain being between a 6 to 7 out of 10.  (*Id.*)  Slight improvements in his pain level and range of motion were noted, but he would continue experiencing increased pain and crepitation upon flexion and extension of the left knee. (*Id.*)

On November 13, 2013, Plaintiff presented to Dr. Tuong Huu Le, M.D., for an MRI of his left knee.  (R. at 957-58.)  Dr. Le noted (1) edema and contusion within the posterolateral tibial plateau without bony depression; (2) small to moderate joint effusion with interstitial edema within Hoffa's fat pad and popliteal fossa; (3) mild tibial spine spurring and mild lateral femoropatellar joint space narrowing, including a 6 x 8 mm osteochondral defect within the inner aspect of the lateral tibial plateau subadjacent to the tibial spine; (4) grade II strain of the semimembranosus tendon; and (5) increase in the anterior horn of the lateral meniscus likely due to a intrameniscal cyst with associated horizontal cleavage tear. (*Id.*)

On January 6, 2014, Plaintiff presented to Dr. Steven Thorton, M.D., for a left arthroscopic partial lateral meniscectomy and abrasion arthroplasty of the left lateral tibial plateau due to a complex tear of the lateral meniscus. (R. at 861-62.)  Dr. Thorton's pre- and post-operative diagnoses of his left knee was left lateral meniscus tear and chondral defect of the left lateral tibial plateau. (R. at 861.)  He recommended gentle range of motion and strengthening exercises, with weight-bearing as tolerated. (R. at 862.)

On January 30, 2014, Plaintiff presented to the emergency department of Methodist Charlton Medical Center with a knot in his left knee. (R. at 662-70.) He complained of pain around the back of the knee, and was concerned about developing a clot from his knee surgery. (R. at 662.) A duplex venous sonogram of his left knee showed no evidence of deep venous thrombosis, but a "tiny knee effusion" was seen. (R. at 664-65, 667.) An x-ray of his left knee also showed a "small effusion," but no fractures, dislocations, or "other significant abnormalities" were observed. (R. at 669.)

Plaintiff attended twenty-four physical therapy sessions between January 28, 2014 and April 2, 2014. (R. at 819-42.) Throughout this period, he had only slight improvement with his pain level, knee strength, and range of motion. (*Id.*) On March 26, 2014, he reported experiencing increased pain when bending his knee, and it was noted that he would walk with a limp. (R. at 821.)

On May 29, 2014, Plaintiff presented to Dr. Thornton for a post-operative visit following knee arthroscopy. (R. at 789-90.) He had a limited range of motion in his left knee and a mildly antalgic gait. (R. at 790.)

On June 17, 2014, Plaintiff presented to Dr. Jerry Franz, M.D., complaining of pain in his left knee. (R. at 597-98.) He rated his current pain a 6 out of 10, and described it as achy, burning, numbing, sharp, shooting, stabbing, stiff, swelling, throbbing, and tingling in nature. (R. at 597.) It was worse at night after walking for long periods of time. (*Id.*) He was observed walking with a cane. (*Id.*) Dr. Franz reported mild effusion, which was mild to moderate, and "tenderness of the lateral aspect of the left knee with any knee motion." (R. at 598.) He also reported a positive grind test. (*Id.*) Dr. Franz's impression was internal derangement of the left knee, status post partial lateral meniscectomy, chronic pain, and probable continuing changes in the knee compatible with internal derangement. (*Id.*)

On June 30, 2014, Plaintiff was seen by licensed psychologist Maggie Perish, Psy.D., for a psychological evaluation. (R. at 714-23.) He reported feeling upset because his pain continued and a recent surgery did not correct his injury. (R. at 714.) He was in a work conditioning program, which required him to work through pain symptoms that would worsen with each activity. (*Id.*) He needed to reposition his knee often when sitting, which made riding in a car difficult. (*Id.*) He also reported difficulty getting in and out of the bathtub and off the commode. (R. at 714-15.) He was taking hydrocodone every 4 hours and Tramadol in between those periods. (R. at 715.) Plaintiff reported difficulty sleeping due to pain and anxiety over finances. (*Id.*) He rated his pain as ranging between a 6 to 8.5 out of 10, and identified the areas of greatest interference as pain, walking, standing, twisting, sitting, overall lifestyle, and work. (R. at 716.)

Dr. Perish reported that on the Impairment Relationship Scale, his score of 93/105 fell in the "dysfunctional" range, which indicated that "he likely sees pain itself as automatically disabling." (R. at 716.) She noted his belief that he should have the same benefits as the handicapped and has accepted being disabled because of his pain. (*Id.*) She observed him as experiencing high levels of depression and anxiety due to his pain and knee injury. (R. at 717.) It was also noted that there was a strong likelihood that traditional medical treatment would be unsuccessful in reducing his pain symptoms. (*Id.*)

Dr. Perish observed Plaintiff wearing a neoprene support over the left knee, but he did not require any ambulatory aides. (R. at 717.) She also observed him walking with a severe limp and exhibiting pain behaviors, including grimacing, grabbing the left knee, shifting the position of his leg often, and being unable to continue sitting until the conclusion of the interview. (R. at 718.) Dr. Perish opined that Plaintiff had chronic pain syndrome and recommended that he be admitted into

a functional restoration program. (R. at 719.) She noted that previous methods of treating his chronic pain had been unsuccessful or had reached a plateau, and there was an absence of other options likely to result in significant clinical improvement. (R. at 719.)

Plaintiff attended work hardening sessions between June 11, 2014 and August 15, 2014. (R. at 875-909, 921-24.) Although he was observed as working hard to get better, he showed little improvement throughout this time frame. (*Id.*) On July 23, 2014, Plaintiff reported experiencing extreme pain in both knees, which made it harder for him to walk. (R. at 895.) During a session on August 5, 2014, Plaintiff reported that his left knee had "buckled" on him while walking on the treadmill, and he expressed worry that his knee was getting worse. (R. at 886.)

On August 9, 2014, Plaintiff was examined as part of a workers' compensation designated doctor evaluation. (R. at 1002-13.) He reported that his condition worsened after his left knee surgery. (R. at 1007.) He complained of pain in both knees, which he rated a 6 out of 10, as well as popping, tingling, and weakness. (R. at 1009.) His pain was increased by sitting, reaching, sleeping, pushing, lifting, bowel movement, weather changes, standing, walking, sexual activity, pulling, carrying, and bending. (R. at 1009-10.) Plaintiff was wearing braces on both knees and had an antalgic gait. (R. at 1010.) Physical examination showed tenderness popiteal and tibial plateau laterally of the left knee, decreased range of motion in the knees, and atrophy of the left thigh and calf. (R. at 1010-11.) His right knee was tender at the lateral joint line and patellar region, but had a negative Lachman and McMurray test. (R. at 1011.) Plaintiff could only heel and toe walk with difficulty. (*Id.*) It was noted that he had not reached maximum medical improvement. (R. at 1012.)

On August 18, 2014, Plaintiff returned to Dr. Franz for a follow-up, and it was noted that all of his medical records had disappeared with his medical chart. (R. at 600-01.) He complained of

experiencing pain in both knees, which would worsen by walking and bending. (R. at 600.) He was wearing a left knee brace and walking without an assistive device. (R. at 601.) Physical examination of his left knee revealed tenderness along the tibial plateau, lateral laxity, and reduced range of motion testing. (*Id.*) His right knee was observed as having crepitus 50% of the time with increasing pain, tenderness along both joint lines, and a positive grind test. (*Id.*) Dr. Franz opined that his right knee was also injured when he fell in October 2013, "and appropriate imaging studies should be performed to elucidate any cartilage damage in the knee." (*Id.*)

On September 15, 2014, Plaintiff visited Dr. Franz for a routine follow-up. (R. at 602-03.) Plaintiff's participation in the work hardening program had been suspended because he was not making any progress. (R. at 602.) He was walking without an assistive device. (R. at 603.) Dr. Franz's assessment of both knees was consistent with the prior visit. (*Id.*) He ordered a new leg brace to address Plaintiff's lateral instability. (*Id.*)

On September 24, 2014, Plaintiff presented to Dr. Robert Holladay, M.D., for a post designated doctor's required medical examination. (R. at 931-39.) Plaintiff underwent an extensive medical history assessment and physical examination. (R. at 932.) He was noted as taking Ultram and hydrocodone, and he reported experiencing difficulties in standing, sitting, reclining, and walking. (R. at 935-36.) Dr. Holladay physically examined Plaintiff and noted that he had reduced lumbar spine range of motion, but he observed no tenderness or muscle spasms of the lumbar spine. (*Id.*) He also noted that straight-leg raises did not cause Plaintiff back pain or radiating leg pain. (*Id.*) Dr. Holladay observed tenderness over the lateral joint line of the left knee, as well as over the medial and lateral joint line of the right knee. (*Id.*) He also observed reduced range of motion of the left knee and crepitation of both knees. (*Id.*) Plaintiff wore a knee brace for the right knee and

ambulated with a limp to the left. (R. at 936-37.) Dr. Holladay opined that Plaintiff was at maximum medical improvement and had not progressed well since his surgery. (R. at 937-38.) He also opined that based on the loss of range of motion to the left knee, Plaintiff had suffered an "8% whole person impairment" as a result of the October 23, 2013 injury. (R. at 938.)

On January 16, 2015, Plaintiff presented for a follow-up regarding his left knee surgery and was seen by Dr. John Sazy, M.D. (R. at 969-70.) Plaintiff reported that since his left knee scope about a year ago, he continued experiencing pain and locking with weight-bearing and ambulation. (R. at 969.) Dr. Sazy observed an antalgic gait with a left leg limp despite Plaintiff wearing a brace. (*Id.*) He also observed medial and lateral joint line pain, and reduced range of motion. (*Id.*) He reported that Plaintiff had a positive McMurray test, which was indicative of a tear in the meniscus. (*Id.*) Dr. Sazy's assessment was degenerative joint disease of the left knee with recurrent medial lateral meniscal tears. (R. at 970.)

On January 27, 2015, an MRI of Plaintiff's left knee showed thinning of the posterior horn of the lateral meniscus and defect or tear of the inferior articular surface of the meniscus. (R. at 727.) The MRI showed no evidence of fracture, bone bruising, osteonecrosis, intra-articular loose body, chondromalacia, or synovial cyst. (*Id.*)

On February 9, 2015, Plaintiff presented to Dr. Franz for a routine follow-up visit. (R. at 612-13.) He rated his pain as being between a 5 and 6 out of 10. (R. at 612.) His pain would worsen with weight bearing and improve when he rested and wore his knee braces. (*Id.*) Dr. Franz assessed Plaintiff with chronic panic and continued changes in the left knee compatible with internal derangement. (*Id.*)

On March 17, 2015, Plaintiff underwent a functional capacity examination at the request of

Dr. Franz. (R. at 618-41.)  He described his right knee pain as "low intense" and his left knee pain as "high moderate."  (R. at 618.)  His gait was "abnormal with antalgia," and his lower extremity dexterity was considered "below accepted norms."  (R. at 618.)  He displayed excellent effort during testing but had  difficulty with normal range of motion when compared to accepted norms.  (R. at 619.)  He had difficulty with a lifting test, which was suspended due to knee instability and weakness, and his inability to complete the test indicated that lifting would be an unsafe work activity.  (*Id.*)

Plaintiff also had weakness in the lower extremity dexterity, biomechanics, gait ability, lift and pinch grip testing, which was "indicative of a nerve injury, muscle weakness and/or deconditioning." (R. at 619.)  It was noted that this weakness would "make it difficult for him to perform his job safely and efficiently."  (*Id.*)  Plaintiff exhibited protective behaviors while crouching, stooping, kneeling, stepping, balancing, standing, sitting, pulling, and pushing. (R. at 622).  His barriers to work were noted as an inability to crouch, kneel, stoop, climb, stand for prolonged periods, sit for prolonged periods, or work a 40 hour work week. (R. at 622, 624-25.)  Testing on the treadmill was discontinued because Plaintiff was "[u]nable to perform without rail assistance." (R. at 641.)

On May 5, 2015, Plaintiff presented to Dr. Franz for a follow-up evaluation.  (R. at 593-94.)  He complained of pain in both knees, but it was worse in the left knee.  (R. at 593.)  His current pain was a 7 out of 10.  (*Id.*)  He was wearing his left knee brace.  (R. at 594.)  Dr. Franz reported that his left knee appeared more mobile, but range of motion remained decreased, and his right knew showed creptius with mild effusion.  (*Id.*)  Plaintiff had "decent pain control," and he reported being able to do some activities around the house.  (*Id.*)

9

On June 2, 2015, Plaintiff returned to Dr. Franz for a follow-up. (R. at 591-92.). He continued having pain in both knees, but Dr. Franz noted a 30% improvement in his pain level. (R. at 591.) Plaintiff reported that his pain interfered with his work, sleep, daily routine, and recreation. (*Id.*) His pain would worsen with weight bearing, climbing stairs, kneeling, and standing for long periods of time. (*Id.*) Physical examination showed tenderness along the tibial plateau of the left knee with persistent laxity of 5 degrees, and crepitus and mild effusion on the right knee. (R. at 592.) Plaintiff was wearing his left knee brace. (*Id.*) It was also noted that Plaintiff's activities were limited, but he was able to do chores around the house. (*Id.*)

Plaintiff presented to Dr. Johnny Gates, M.D., for multiple visits regarding his knee pain between December 14, 2015 and June 13, 2016. (R. at 691-98.) On January 25, 2016, Dr. Gates noted that Plaintiff was experiencing back pain in addition to his knee pain. (R. at 694.)

On April 7, 2016, an x-ray of Plaintiff's cervical spine showed multilevel cervical spondylosis with endplate osteophytes most pronounced at C4-C5 and C5-C6, and mild compression fracture deformities at C5 and C6. (R. at 656.) It was noted that these mild compression deformities were also observed on a previous cervical spine x-ray from December 27, 2012. (*Id.*) An x-ray of the lumbar spine showed multilevel lumbar spondylosis with endplate osteophytes and mild lumbar dextroscoliosis. (R. at 657.) Atheresclerotic calcification of the abdominal aorta was observed, but the x-ray showed no evidence of lumbar fracture or listhesis. (*Id.*) An MRI of Plaintiff's lumbar spine showed multiple protrusions and herniations, with the most pronounced being at L4-L5 and resulting in impingement on the L4 nerve root. (R. at 658-59.)

On April 21, 2016, Dr. Gates completed a medical source statement of Plaintiff's ability to do physical work-related activities. (R. at 648-54.) Dr. Gates opined that Plaintiff's use of a cane

was medically necessary and he would not be able to ambulate very far without it. (R. at 649.) Dr. Gates estimated that in an 8-hour work day, Plaintiff would only be able to sit for 5 to 10 minutes, stand for 10 minutes, and walk for 5 minutes. (*Id.*) He noted that Plaintiff's lower back pain, which was caused by a herniated disc, prevented him from standing, sitting, or walking for long periods of time. (R. at 650.) It also caused his symptoms of weakness in the legs, along with sensations of tingling, numbness, and burning. (*Id.*) Dr. Gates also noted that a bulging disc in Plaintiff's neck, which was pressing against a nerve, was causing numbness and tingling in his hands and arms. (*Id.*)

Dr. Gates opined that Plaintiff's physical impairments prevented him from being able to climb stairs, ramps, ladders, or scaffolds; balance; stoop; kneel; crouch; or crawl. (R. at 651.) He also opined that Plaintiff would not be able to perform activities like shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker, 2 canes, or 2 crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; or climb a few steps at a reasonable pace with the use of a single hand rail. (R. at 653.) Dr. Gates expected that the physical limitations of Plaintiff would last for twelve consecutive months. (*Id.*)

### 3.    Hearing Testimony

On October 26, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 37-77.) Plaintiff was represented by an attorney. (R. at 39.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he was 47 years old and had last worked in October 2013. (R. at 41.) He worked in maintenance from 2001 to 2006, and had a supervisory role in maintenance from 2006 to 2013. (R. at 42-43.) As a supervisor, he would manage and maintain apartments, but would also do other activities that included moving appliances and installing air conditioning and heating units.

11

(R. at 43.)  He tore the meniscus in his left knee in 2013, and had left knee surgery in 2014.  (*Id.*)  He also had problems with his right knee.  (*Id.*)  He needed a cane for ambulation, and it was prescribed by a doctor.  (*Id.*)  He still wore braces on both knees.  (*Id.*)

Plaintiff's surgery did not correct the problem with his left knee. (R. at 44.)  He had been diagnosed with lupus, which caused him issues such as joint pain, blurred vision, rashes and swelling.  (*Id.*)  He also had problems with his lower back and neck.  (R. at 45.)  He lived with his spouse and 19-year-old son.  (*Id.*)  He was able to drive and had driven himself to the hearing.  (*Id.*)  He would need stop and stretch out his knee when driving for long distances.  (R. at 47.)  Plaintiff was in school until the eleventh grade and could read, write, and do basic math.  (*Id.*)  He had been taking Clonidine, Ibuprofen, Naproxen, Tramadol, and Tylenol #3.  (*Id.*)

Plaintiff's pain did not improve after his left knee surgery in 2014, and he believed that his knee problems had been worsening.  (R. at 50-51.)  He was still experiencing weakness and instability in that knee.  (R. at 51.)  He had a tendency to fall and needed to use a cane for stability.  (*Id.*)  He attempted physical therapy, but it made his pain worse. (R. at 52.)  The recommended exercises failed to strengthen his knee, and he lost a lot of muscle mass in his left leg.  (*Id.*)

Plaintiff had worn a left knee brace since the 2014 surgery. (R. at 53.)  It did not help with the pain, but helped stabilize the left knee.  (*Id.*)  Despite the brace, he would still fall.  (*Id.*)  He had been using a cane for about two years, based on the recommendation of his doctor.  (R. at 54.)  He did not need to use the cane when going short distances around the house, but would use it every time he left the house. (*Id.*)

Plaintiff also had pain in his right knee at the time of the left knee injury. (R. at 55.)  He underwent therapy for his right knee, but it did not help with his right knee pain or weakness.  (R.

at 55-56.)  He wore a knee brace on his right knee when it felt unstable, which occurred approximately six times a month.  (R. at 56-57.)  He agreed that the pain in his left knee was worse, and it was constant. (R. at 58.)  He rated his left knee pain between a 7 and 8 out of 10.  (*Id.*)  The severity of pain in his right knee would "fluctuate," but would worsen when walking. (*Id.*)

Plaintiff also experienced problems with his neck and lower back.  (R. at 58-59.)  He began experiencing neck pain in 2009, and believed the 2013 work accident aggravated it.  (R. at 59-60.)  The neck pain was constant and "a little bit worse" than his left knee pain.  (R. at 60-61.)  The pain would radiate down both arms, and felt like burning, numbness, and stiffness.  (R. at 61.)  The neck pain would "come and go" throughout the day and limited his ability to do prior activities, like mowing the yard and lifting objects.  (R. at 62.)

Plaintiff began experiencing low back pain in the early nineties, but it was aggravated by the 2013 work accident. (R. at 63.)  He had been doing therapy for his back, and Dr. Gates was looking into possible treatment for his neck and back.  (R. at 63-64.)  He tried to avoid lifting more than six or seven pounds. (R. at 69.)  He believed that his pain would prevent him from being able to maintain attention and concentration for even a sedentary job. (R. at 70).  It was noted that Plaintiff changed positions multiple times during the hearing. (R. at 69.)

### b.    VE's testimony

The VE classified Plaintiff's past work as a building maintenance repairer, which was classified by the *Dictionary of Occupational Titles* (DOT) as medium with an SVP of 7. (R. at 72.)  As performed by Plaintiff, the work should be classified as "heavy to very heavy," however. (*Id.*)  He also had past work as a maintenance supervisor, which was classified by the DOT as light with an SVP of 7, but as actually performed by Plaintiff, it should be classified as "heavy."  (*Id.*)

13

The VE considered a hypothetical person of Plaintiff's age, education, and past work experience who could perform no greater than medium work with the following limitations: frequently stoop; occasionally balance, crouch, crawl, and kneel; occasionally climb stairs; never climb ladders; and avoid extended exposure to the sun.  (R. at 73.)  The hypothetical person could not perform Plaintiff's past relevant work, but could perform work as a linen room attendant. (*Id.*)  This work was classified by the DOT as medium with an SVP of 2, with 96,000 jobs available in the national economy.  (*Id.*)

The ALJ asked the VE whether sufficient jobs existed for a second hypothetical person of Plaintiff's age, education, and work experience who could perform no greater than light work with the following limitations: occasionally stoop, balance, crouch and crawl; occasionally climb stairs; never climb ladders; and avoid extended exposure to the sun.  (R. at 74.)  The VE opined that the second hypothetical person could perform work as a mail clerk, which was classified by the DOT as light with an SVP of 2, with 55,000 jobs available in the national economy.  (*Id.*)

If the second hypothetical person was further limited to work at the sedentary level, the person could work as a final assembler, which was classified by the DOT as sedentary with an SVP of 2, with 28,000 jobs available in the national economy, and as a document preparer, which was classified by the DOT as sedentary with an SVP of 2, with 98,000 jobs available in the national economy.  (R. at 74.)  There would be no work available for this person if he or she had to miss a day of work each week for medical reasons.  (R. at 75.)  The VE's testimony was consistent with the DOT.  (*Id.*)

When Plaintiff's attorney asked what an employer would usually tolerate in terms of "off-task behavior," the VE responded "[n]o more than approximately 10% of an eight-hour workday."

(R. at 75.)  His response was based on a piecemeal work study conducted by the Department of Labor.  (R. at 75-76.)

**C.    ALJ's Findings**[2]

The ALJ issued her decision denying benefits on January 11, 2017.  (R. at 20-33.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of October 23, 2013.  (R. at 22.)  At step two, the ALJ found that he had the following severe impairments: diseases of cervical and lumbar spine; chronic pain of bilateral knees; systemic lupus erythematosus; and obesity.  (*Id.*)  Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the social security regulations.  (R. at 23.)

Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work with the following limitations: occasionally stoop, crouch, crawl, kneel, and balance; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and avoid extended exposure to the sun.  (R. at 23.)  At step four, the ALJ determined that Plaintiff had past relevant work as a building maintenance repairer and a maintenance supervisor.  (R. at 26-27.)  At step five, the ALJ found that although Plaintiff was not capable of performing past relevant work, considering his age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that he could perform.  (*Id.*)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time from October 23, 2013, the alleged onset date, through the date of the ALJ's decision.  (R. at 28.)

---

[2]  It was noted that the original ALJ assigned to the case had retired before rendering a decision, but an additional hearing was deemed unnecessary under HALLEX I-2-8-40. (R. at 20.)

## II. ANALYSIS

### A. <u>Legal Standards</u>

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id*. Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

## 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during

the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies

his or her burden under the first four steps, the burden shifts to the Commissioner at step five to

show that there is other gainful employment available in the national economy that the claimant is

capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference

to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other

similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant

is not disabled at any point in the five-step review is conclusive and terminates the analysis.

*Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**     **Issues for Review**

Plaintiff presents two issues for review:

(1)     The ALJ erred in making an erroneous finding at Step Three.

(2)     The ALJ erred in providing an RFC that was not supported by substantial
         evidence.

(doc. at 22-1 at 10-11.)

**C.**     **Step Three Listing Analysis**

Plaintiff asserts that the ALJ failed to properly consider whether he met or medically equaled

the severity of a listed impairment. (doc. 22-1 at 11-14.)

If a claimant is not working and is found to have a severe impairment at step two that meets

the duration requirement, the ALJ must determine at step three whether the claimant's impairment

meets or medically equals one of the impairments listed in the regulations.[3] *Compton v. Astrue*, No.

3:09-CV-051513-B-BH, 2009 WL 4884153, at *6 (N.D. Tex. Dec. 16, 2009) (citing 20 C.F.R. §

404.1520). The listed impairments in the Social Security regulations "are descriptions of various

---

[3] These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

physical and mental illnesses . . . most of which are categorized by the body system they affect." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990). "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Id*. at 530. If the claimant's impairment meets or medically equals a listed impairment, the disability inquiry ends, and the claimant is entitled to benefits. 20 C.F.R. § 404.1520(d).

The claimant bears the burden of proving that his impairments meet or equal the criteria found within the Listings. *Henson v. Barnhart*, 373 F. Supp. 2d 674, 685 (E.D. Tex. 2005) (citing *McCuller v. Barnhart*, 72 F. App'x 155, 158 (5th Cir. 2003)); *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). To meet a listed impairment, the claimant's medical findings, i.e., symptoms, signs, and laboratory findings, must match *all* those described in the listing for that impairment. 20 C.F.R. § 404.1525(d). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). To equal a listing, the claimant's unlisted impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531 (emphasis in original); *see also* 20 C.F.R. § 404.1526(b)(2). The ALJ is to consider all of the evidence that is relevant to the claimant's impairments and their effects, but must not consider vocational factors such as age, education, and work experience. 20 C.F.R. § 404.1526(c); see *Sullivan*, 493 U.S. at 531-32 (explaining that the overall functional impact of the claimant's unlisted impairment or combination of impairments cannot be used to justify the determination of equivalence of a listed impairment). "[T]he responsibility for deciding medical equivalence rests with the [ALJ]." 20 C.F.R. § 416.1526(e).

### 1. Listing 1.02

Plaintiff contends that the ALJ erred in finding that his impairments did not meet or equal Listing 1.02 relying in part on *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007). (doc. 22-1 at 12.)

Listing 1.02A[4] involves "major dysfunction of a joint(s) . . . characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)" with involvement of "one major peripheral weight-bearing joint (i.e., hip, knee, or ankle) resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02(A).

The "inability to ambulate effectively" is defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* § 1.00(B)(2)(b)(1). Some examples of ineffective ambulation include "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.* § 1.00(B)(2)(b)(2). Conversely, "individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living" to be considered able to "ambulate effectively." *Id.* Such individuals "must have the ability to travel

---

[4] Although Plaintiff generally refers to Listing 1.02 in his brief, he quotes the definition of Listing 1.02A as "the relevant part of Listing 1.02," and does not reference or discuss the other provisions of Listing 1.02 that Plaintiff's impairments might have met or equaled. (*See* doc. 22-1 at 12-13.)

without companion assistance to and from a place of employment or school." *Id.* Nevertheless, "[t]he ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." *Id.*

In *Audler*, the Fifth Circuit held that the ALJ committed legal error when she "summarily concluded" that the claimant's impairments were not severe enough to meet or medically equal one of the listed impairments, but "did not identify the listed impairment for which [the claimant's] symptoms fail[ed] to qualify," and did not "provide any explanation as to how she reached the conclusion[.]" *Audler*, 501 F.3d at 448. Noting that an ALJ was not "always required to do an exhaustive point-by-point discussion," the *Audler* court stated that it simply could not "tell whether her decision [was] based on substantial evidence" because she "offered nothing to support her conclusion at this step." *Id.* (internal quotation marks omitted) (quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).

Applying *Audler*, courts have found that even when an ALJ specifically identifies a listing at step three, she errs by failing to discuss the medical evidence and provide the reasons for the step three determination because the failure prevents meaningful judicial review. *Woods v. Colvin*, No. 3:14-CV-1990-B-BH, 2015 WL 5311142, at *11 (N.D. Tex. Aug. 26, 2015), *adopted by* 2015 WL 5319926 (N.D. Tex. Sept. 10, 2015) (citing cases); *see, e.g.*, *Jones v. Colvin*, No. H-13-1221, 2014 WL 3827819, at *9 (S.D. Tex. July 31, 2014) (concluding that the ALJ erred by failing to discuss evidence or provide reasoning for the step three determination); *Matthews v. Astrue*, No. 11–667–RLB, 2013 WL 5442265, at *4-5 (M.D. La. Sept. 27, 2013) (finding error where the ALJ specifically stated that she considered a listing but did not explain the basis for concluding that the claimant's sensory loss was due to an unrelated problem, and failed to discuss or mention any

evidence relating to the remaining criteria); *Inge ex rel. D.J.I. v. Astrue*, No. 7:09-CV-95-O, 2010 WL 2473835, at *9 (N.D. Tex. May 13, 2010) (finding that the ALJ erred by not specifically identifying the evidence he relied on for his conclusion at step three), *adopted by* 2010 WL 2473598 (N.D. Tex. June 16, 2010). "Although it is not always necessary that an ALJ provide an exhaustive discussion of the evidence, bare conclusions, without any explanation for the results reached, may make meaningful judicial review of the Commissioner's final decision impossible." *Inge ex rel. D.J.I.*, 2010 WL 2473835, at *9 (citing *Audler*, 501 F.3d at 448).

At Step Three, the ALJ stated that she considered "[t]he listings in 1.02 Major Dysfunction of a Joint, 1.04 Disorder of the Spine and 14.02 Systemic Lupus Erythematosus," as well as the "additional and cumulative effects of the claimant's obesity." (R. at 23.) Without any explanation or analysis, the ALJ stated that "the evidence of record does not reflect all of the findings required in the List of Impairments, nor do the clinical findings, imaging studies, or laboratory tests shows the severity contemplated in the listings." (*Id.*) The ALJ summarily concluded that Plaintiff did not have an impairment or combination of impairments that met or was medically equivalent to a listed impairment. (*Id.*) Her conclusory determination was error. *See Savoie v. Colvin,* No. 14-30-JJB-RLB, 2015 WL 1004217, *5 (M.D. La. Mar. 5, 2015) (citing *Audler*, 501 F.3d at 448); *Tribble v. Colvin*, 3:13-CV-2321-BF, 2014 WL 4805776, *3-4 (N.D. Tex. Sept. 29, 2014) (citing *Audler*).

## 2. Harmless Error

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected. . . . The major policy underlying the harmless error rule is to preserve judgments and to avoid waste of time." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (quoting *Mays v.*

*Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)) (per curiam). "[P]rocedural improprieties . . . will therefore constitute a basis for remand *only if* such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Alexander v. Astrue*, 412 F. App'x 719, 722 (5th Cir. 2011) (emphasis added); *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). The ALJ's error is harmless if the substantial rights of a party have not been affected. *See Alexander*, 412 F. App'x at 722. Courts must therefore consider whether an ALJ's error in failing to discuss why he or she finds a claimant does not meet a Listing at step three was harmless. *See Audler*, 501 F.3d at 448 (citing *Morris v. Bowen*, 864 F.2d 333, 334 (5th Cir. 1988)) (applying harmless error analysis when the court ruled that the ALJ's failure to set out the bases for her decision at step three was erroneous). "In considering whether a step three error was harmless in *Audler*, the Fifth Circuit reviewed the evidence to determine whether the claimant had demonstrated that she satisfied all the criteria of the Listing at issue." *Pannell v. Astrue*, No. 3:11-CV-2385-D, 2012 WL 4341813, at *3 (N.D. Tex. Sept. 21, 2012) (citing *Audler*, 412 F.3d at 448-49).

Listing 1.02A requires "appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint," which includes the knee. 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02(A). Here, a November 2013 MRI of Plaintiff's left knee showed edema and contusion within the posterolateral tibial plateau; small to moderate joint effusion; mild tibial spine spurring and mild lateral femoropatellar joint space narrowing; osteochondral defect within the inner aspect of the lateral tibial plateau; grade II strain of the semimembranosus tendon; possible intrameniscal cyst with associated horizontal cleavage tear. (R. at 957-58.). On January 6, 2014, Plaintiff underwent an arthroscopic partial lateral meniscectomy and abrasion arthroplasty of his left knee, which revealed a left lateral meniscus tear and chondral defect left lateral tibial plateau. (R.

at 862.) An x-ray of his left knee on January 30, 2014, revealed a small effusion. (R. at 669.) The next year, an MRI of Plaintiff's left knee showed thinning of the meniscus and evidence that the meniscus was torn or defective. (R. at 727.) The medical evidence therefore supports the threshold diagnostic requirement of Listing 1.02A, with Plaintiff having a major dysfunction of a joint as shown by MRI findings of joint space narrowing in his left knee. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02(A).

According to Social Security Regulations, Plaintiff's impairment must result in his inability to ambulate effectively, which is "an extreme limitation of the ability to walk." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.00(B)(2)(b)(2), 1.02(A). Here, the majority of the medical records note that he had an abnormal gait. (R. at 595, 598, 618-19, 621, 718, 790, 815, 821, 860, 936-937, 969, 1010). The progress notes from his physical therapy and work hardening sessions noted continuing pain, instability, weakness, and limited range of motion with his left knee despite months of therapy and exercise. (R. at 819-830; 843; 875-909, 921-24.) During several examinations, Dr. Franz observed numerous clinical signs of severe limitations in both knees. (R. at 592, 594-95, 598, 601, 603, 607, 609, 611-13, 615, 617). Plaintiff repeatedly mentioned his inability to carry out many activities of daily living and limited ability to travel without companion assistance because of his left knee, as reflected in his self-reported function reports (R. at 228-33; 255-61); the medical notes of Dr. Franz (R. at 591-94); the June 30, 2014 psychological report of Dr. Perish (R. at 714-16); and the progress notes from his rehabilitation sessions in 2014 (R. at 896, 902). He also had to terminate a treadmill test because he was unable to use the treadmill without rail assistance. (R. at 641.) The record supports a finding that he was unable to ambulate effectively. *See e.g., Woods v. Colvin*, No. 3:14-CV-1990-B-BH, 2015 WL 5311142, at *14 (N.D. Tex. Aug. 26, 2015) (observing claimant's

inability to perform treadmill test because of pain and abnormal ambulation and substantial medical records noting abnormal gain), *adopted by* No. 3:14-CV-1990-B-BH, 2015 WL 5319926 (N.D. Tex. Sept. 10, 2015)*; Hermosillo v. Astrue*, No. 1:10-CV-00198-BG, 2011 WL 4528206, at *4 (N.D. Tex. Sept. 12, 2011) (observing that the majority of the medical records indicated that the claimant had antalgic gait), *adopted by* 2011 WL 4528374 (N.D. Tex. Sept. 30, 2011). Lastly, Plaintiff's medical records show that his condition had worsened over the years (R. at 937-38 (noting lack of progress since the 2014 surgery)), and the knee impairments had persisted over a period of 12 months (*See* R. at 590-641, 655-971 (showing the consistent medical records of pain and physical limitations of his left knee condition from October 2013 through June 2016)).

The medical evidence seems to satisfy all of the criteria for Listing 1.02A at step three. *See Hermosillo*, 2011 WL 4528206 at *5 (listing record evidence supporting claimant's argument that he met the criteria of a listing, the court noted that "[n]o medical evidence contradicted these findings, and absent an explanation from the ALJ, it appears that [the claimant] met his burden of showing that he meets the requirements of" the listing).

The Commissioner argues that the ALJ did not err because there were no medical findings supporting Plaintiff's inability to ambulate effectively, i.e., that he "regularly used a hand held assistive device, was unable to walk a block at a reasonable pace on rough or uneven surfaces, was unable to use public transportation, could not carry out routine ambulatory activities, and was unable to climb a few steps at a reasonable pace with the use of a handrail." (doc. 23 at 2-4.) While the regulations cite these activities as examples of ineffective ambulation, the definition of "inability to ambulate effectively" is not limited to these examples. (*See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B(b)(2) ("examples of ineffective ambulation *include, but are not limited to . . .*") (emphasis

added).  To meet or equal the criteria of Listing 1.02A, there must be findings of "an extreme limitation of the ability to walk." *Id.* § 1.00(B)(2)(b)(1).

The record contains other medical findings supporting Plaintiff's inability to ambulate effectively.  It was noted in a psychology evaluation that he was no longer able to walk very much, could not go shopping, and had difficulty bathing and getting on and off a commode because of his knee. (R. at 714-15.) During his work hardening sessions, Plaintiff reported experiencing difficulty going up and down the stairs, doing chores around the house, and grocery shopping.  (R. at 896, 902.)  His inability to perform certain exercises and limited improvement of his left knee was also noted throughout these sessions.  (*Id.*)  Dr. Franz noted the worsening of Plaintiff's knee pain when he attempted to climb stairs, kneel, and stand for long periods.  (R. at 591.)

In conclusion, Plaintiff's medical evidence shows that his left knee impairment may meet the criteria of a listed impairment under Listing 1.02A.  The ALJ's failure to cite to medical evidence and give reasons for her decision at step three affected Plaintiff's substantial rights. *Audler*, 501 F.3d at 449 ("Absent some explanation from the ALJ to the contrary, [the claimant] would appear to have met her burden of demonstrating that she meets the Listing requirements..., and therefore her substantial rights were affected by the ALJ's failure to set out the basis for her decision at step three."); *see also Hermosillo*, 2011 WL 4528206, at *5 (finding that the ALJ's failure to explain at step three affected the claimant's substantial rights).  The error is not harmless, and remand is required.[5]

### III.    CONCLUSION

Plaintiff's summary judgment motion is **GRANTED**, and the Commissioner's decision is

---

[5]  Because the ALJ committed legal error at step three with respect to Listing 1.02A, which requires the reversal and remand of the ALJ's decision, the Court does not reach the remaining issues.

**REVERSED** and **REMANDED** for reconsideration.

      **SO ORDERED**, on this 22nd day of March, 2019.

                                                         IRMA CARRILLO RAMIREZ
                                                UNITED STATES MAGISTRATE JUDGE